POMEROY COOPERATIVE GRAIN COMPANY, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 64590. Filed December 31, 1958.

*James M. Stewart, Esq.*, and *Rolland E. Grefe, Esq.*, for the petitioner.

*Ivan L. Onnen, Esq.*, for the respondent.

PIERCE, *Judge:* Respondent determined deficiencies in petitioner's income taxes as follows:

| Year ended June 30 | Deficiency |
|---|---|
| 1953 | $1,191.96 |
| 1954 | 4,159.00 |
| 1955 | 6,211.09 |

The issues for decision are whether the petitioner, a non-tax-exempt farmers' cooperative association, is entitled to exclude from its gross income, as part of its "patronage dividends," [1] amounts allocated for credit and subsequent distribution to its "members" only, out of the following:

(1) Compensation received by petitioner from the Commodity Credit Corporation (not a member of the cooperative), for handling and storing grain which producers of such grain (including both members and nonmembers of the cooperative) had surrendered to such Government agency at petitioner's elevator, in satisfaction of Government crop loans.

(2) Compensation received by petitioner from others than the Commodity Credit Corporation (including both members and non-members), for storing grain owned by such persons. The allocations of patronage dividends out of this compensation were not proportionate to the amounts of storage business transacted with the members for whose benefit such allocations were made.

All other issues raised in the pleadings were abandoned by petitioner at the trial. Such abandoned issues pertained to determinations of respondent, that petitioner, in computing its patronage dividends, (1) had improperly allocated expenses with respect to its merchandise department, and (2) was not entitled to exclude from its gross income certain savings and income of its grain department, which were derived from cleaning grain, from rents, from patronage refunds received, and from patronage refund adjustments.

### FINDINGS OF FACT.

Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

---

[1] Such "patronage dividends," which are hereinafter more fully described, are also commonly referred to as "Patronage Rebates" or "Patronage Refunds." Petitioner, in its income tax returns, used the designation "Patronage Refunds."

The petitioner, Pomeroy Cooperative Grain Corporation, is an Iowa corporation, which has its principal place of business at Pomeroy, Iowa. During all taxable years involved, it qualified and was operated as a farmers' "cooperative association" under chapter 499 of the Codes of Iowa, 1950 and 1954.[2] It did not qualify (which it concedes) as a tax-exempt cooperative, under section 101 (12) of the Internal Revenue Code of 1939, or under section 521 of the Internal Revenue Code of 1954. It kept its books of account and filed its Federal income tax returns on the basis of fiscal years ended June 30, and in accordance with an accrual method of accounting. Its returns for all the taxable years involved were filed with the district director of internal revenue for the District of Iowa.

*Facts re Capital Structure, Operations, and Facilities.*

Petitioner had authorized capital stock of $30,000, divided into 600 shares of class A voting common stock of the par value of $25 per share, 100 shares of class B nonvoting common stock of the par value of $25 per share, and 2,500 shares of nonvoting preferred stock of the par value of $5 per share. The numbers of shares outstanding at the close of each of the taxable years involved, were as follows:

| Year ended June 30 | Common shares (both classes) | Preferred shares | Total par value |
|---|---|---|---|
| 1953 | 351 | 708 | $12, 315 |
| 1954 | 356 | 690 | 12, 350 |
| 1955 | 357 | 600 | 11, 925 |

Under petitioner's articles of incorporation, as amended and in force during the taxable years, only holders of the common stock (class A and class B) were "members" of the association; and it was only to members that "patronage dividends," hereinafter described, could be allocated or paid. No one was permitted to hold more than 1 share of common stock, either of one class or the other. The class A voting common stock could be held only, (a) by farm operators who engaged in the production of farm products, or who consumed supplies handled by petitioner, or who used services rendered by petitioner; and (b) by landlords who received shares of agricultural products as rent. The class B nonvoting common stock was held by other persons who desired to obtain the benefits of patronage dividends allocated or paid by petitioner. The preferred stock was issued primarily for the purpose of raising capital; and it could be issued at such times and in such amounts as petitioner's board of directors determined. Noncumulative ordinary dividends (as distinguished from patronage dividends) were paid from time to time both on the common stock of each class, and

---

[2] This chapter of said Iowa Codes provides that: " 'Association' [as used therein] means a corporation formed under this chapter."

on the preferred stock; and such dividends when declared were at the rate of 4 per cent per annum. The board of directors was composed of nine members who were elected each year by the class A stockholders from among themselves; and the officers of the corporation were elected by the directors from their own number.

The business activities of petitioner were carried on through two departments, known as the grain department and the merchandise department; and each of these departments transacted business both with members and with nonmembers. Through the grain department, petitioner bought and sold grain, including corn, oats, and soybeans; and it also performed various services related to the handling, storing, and conditioning of grain. The principal facility employed in performing such functions was an elevator structure located adjacent to a rail siding, which was equipped for receiving, weighing, testing, conditioning, and loading grain. Through the merchandise department, petitioner sold fencing, hardware, and other supplies used principally by farmers. As before indicated, only certain income received through the grain department is here involved.

Petitioner received grain through its grain department under three distinct circumstances: (1) A portion of such grain was purchased by it from producers, including both members and nonmembers, at the time of the delivery of this grain at petitioner's elevator; (2) another portion was delivered to it by producers, including both members and nonmembers, in satisfaction of crop loans theretofore made to them by the Commodity Credit Corporation—and this grain was thereafter handled and in some instances stored by petitioner on behalf of said Government agency which became the owner thereof at the time of its delivery at petitioner's elevator; and (3) still another portion was delivered to it by persons other than the Commodity Credit Corporation (including both member and nonmember producers, and by three business organizations which were neither members nor producers), for storage on behalf of these parties who owned such grain. Petitioner's activities with respect to grain received in these three ways are more fully described as follows.

### Facts re Grain Purchased Directly by Petitioner.

Grain which petitioner purchased from producers at the time of its delivery at petitioner's elevator (herein called "direct purchase grain") was, at the time of such delivery, weighed, tested, and unloaded. A scale ticket was prepared; and, if the grain was purchased from one of petitioner's members, he was given credit on petitioner's patronage ledger for the number of bushels which he sold. Title to such grain passed to petitioner at the time of delivery at the elevator; and the grain was then included in petitioner's inventory. The

seller was, either at this time or shortly thereafter, paid the current market price for the grain.

Following such purchase, petitioner either shipped out the grain at once, for sale on the terminal markets where it was purchased by mills or other processors; or retained and sold it locally; or sold it for future delivery, in which event it was held in storage by petitioner until the delivery date specified in the futures contract. Petitioner selected whichever method of marketing it believed would yield the greatest profit.

The amounts of grain of all kinds which petitioner acquired by direct purchase from members and nonmembers during the taxable years, were:

| Year ended June 30 | Bushels purchased from members | Bushels purchased from nonmembers | Total bushels purchased |
|---|---|---|---|
| 1953 | 374, 906 | 37, 850 | 412, 756 |
| 1954 | 314, 944 | 63, 444 | 378, 388 |
| 1955 | 194, 375 | 166, 219 | 360, 594 |

Such grain was of the following kinds:

| Year ended June 30 | Corn (bushels) | Oats (bushels) | Soybeans (bushels) | Total (bushels) |
|---|---|---|---|---|
| 1953 | 218, 962 | 98, 352 | 95, 442 | 412, 756 |
| 1954 | 231, 332 | 46, 376 | 100, 680 | 378, 388 |
| 1955 | 234, 684 | 44, 415 | 81, 495 | 360, 594 |

The gross profits from sales of grain obtained by direct purchase from producers, which petitioner realized in the taxable years, were:

| Year ended June 30 | Gross profits |
|---|---|
| 1953 | $10, 775. 93 |
| 1954 | 13, 753. 01 |
| 1955 | 16, 155. 21 |

These gross profits were included by petitioner in the so-called "gross savings and income" of its grain department, for the purpose of computing patronage dividends.

### Facts re Grain Handled and Stored for the Commodity Credit Corporation.

For many years, including the taxable years involved, the United States Government has, in connection with the price support program of the United States Department of Agriculture, made loans to farmers on grain produced by them. At all times here material, such loans were made by the Commodity Credit Corporation (hereinafter called C. C. C.), an agency of the United States; and they were secured by chattel mortgages on such grain. Each loan was evidenced by a "Pro-

ducer's Note and Supplemental Loan Agreement," which provided in part as follows:

Upon maturity of the note (i. e., the date specified therein or such earlier date as the Corporation may make written demand for payment), the note shall be satisfied by payment and/or by delivery of the commodity subject to the provisions of this section. If a producer desires to deliver the commodity to the Corporation, he should prior to maturity give the county committee which approved the loan written notice of his intention to deliver. The producer shall bear any expenses incurred in connection with the delivery of the commodity to the delivery points shown in the delivery instructions issued to him, such delivery point to be, insofar as practicable, the customary shipping point of the producer, or, shall pay to the holder of the note any costs incurred by the holder as a result of such failure to deliver the commodity to the designated delivery point. * * *

Grain on which the C. C. C. had a loan outstanding was usually stored on the producer's farm until the producer either sold it, or delivered it for the account of the C. C. C. in satisfaction of the loan.

Both during and prior to each of the taxable years here involved, there was in force a "Uniform Grain Storage Agreement" between petitioner, as a warehouseman, and the C. C. C., under which petitioner agreed to receive for the account of such agency, grain which producers might surrender to the agency at petitioner's elevator in satisfaction of such Government loans (which grain is herein called "Government grain"). Under such contract petitioner also agreed to perform certain services for said agency in connection with the handling and storing of such grain, at rates of compensation to be paid by the C. C. C. in accordance with rate schedules in force at times when such services were performed. Petitioner also had other agreements, during said period, with certain county committees which acted as local representatives of the C. C. C., relating to the loading and unloading of Government grain into and out of Government-owned bins.

During each of the taxable years involved, grain was voluntarily surrendered by producers to the C. C. C. at petitioner's elevator, in satisfaction of Government crop loans. The deliveries at petitioner's elevator were made pursuant to written instructions issued to the producers by the county committees which had approved the loans on behalf of the C. C. C. Upon receipt of any such grain, petitioner weighed the same and prepared a scale ticket; and if the grain was delivered by one of petitioner's members, petitioner credited such member on its patronage ledger with the number of bushels delivered. Thereafter, pursuant to written instructions issued to petitioner by one of the county committees, the grain was either shipped out at once to a point designated by such committee, or was stored in petitioner's facilities, or was placed in Government-owned storage bins situated in the locality. If the grain was stored in petitioner's facilities, it was usually commingled with other grain of the same kind; the C. C. C. generally required only that petitioner have available at all times the

number of bushels delivered to it for storage, and that the quality of such grain be at least equal to that which had been so delivered.

Whenever petitioner received such Government grain, it sent a written notice to the appropriate county committee, which showed among other things the date of receipt, the kind of grain, and the quantity and grade thereof. Also, if such grain was stored in petitioner's facilities, a warehouse receipt therefor was issued by petitioner for the C. C. C.

Title to all grain delivered to petitioner by producers in satisfaction of C. C. C. loans passed to said Government agency at the time of such delivery. Petitioner at no time owned any of this Government grain; and it at no time included any of the same in its inventory.

The number of bushels of Government grain so delivered to petitioner during the taxable years, by members and nonmembers of the cooperative, were:

| Year ended June 30 | Member (bushels) | Nonmember (bushels) | Total (bushels) |
|---|---|---|---|
| 1953 | 12, 758 | (1) | 12, 758 |
| 1954 | 237, 871 | 36, 260 | 274, 131 |
| 1955 | 269, 476 | 18, 269 | 287, 745 |

1 None.

Most of such Government grain was corn.

The amounts of compensation received by petitioner from the C. C. C. during the taxable years for handling and storing Government grain, and also the net profits which petitioner realized therefrom after deduction of certain direct expenses, were as follows:

| Services performed | Compensation received for years ended June 30 | | |
|---|---|---|---|
| | 1953 | 1954 | 1955 |
| Taking into petitioner's elevator, grain designated for immediate shipment; and then loading same into boxcars | (1) | $542. 56 | $634. 60 |
| Weighing and putting into petitioner's elevator, grain designated for storage therein | $543. 30 | 2, 028. 54 | 4, 010. 65 |
| Storing grain in petitioner's own facilities | 4, 371. 00 | 5, 145. 48 | 18, 585. 93 |
| Removing grain from storage in petitioner's facilities, and loading same into boxcars | 176. 77 | (1) | (1) |
| Placing grain in Government-owned bins | (1) | 6, 291. 66 | 5, 364. 39 |
| Removing grain from Government-owned bins, transporting same to petitioner's elevator, and weighing it | 642. 40 | 4, 870. 97 | 3, 233. 69 |
| Taking into petitioner's elevator, grain removed from Government-owned bins; and loading same into boxcars | 1, 925. 36 | 9, 938. 55 | 5, 341. 81 |
| Total compensation received for handling and storing Government grain | 7, 658. 83 | 28, 817. 76 | 37, 171. 07 |
| Less: Direct expenses | 441. 76 | 3, 750. 48 | 2, 733. 03 |
| Net profits realized | 7, 217. 07 | 25, 067. 28 | 34, 438. 04 |

1 None.

The above net profits were included by petitioner in the "gross savings and income" of its grain department, for the purpose of computing patronage dividends.

Neither the C. C. C., nor any of the county committees, was a member of the petitioner cooperative association.

*Facts re Grain Stored for Others Than Commodity Credit Corporation.*

During all taxable years involved, petitioner received grain at its elevator for storage therein on behalf of others than the C. C. C. In all of such taxable years, storing was done for producers, including both members and nonmembers of the cooperative; and, in the first of such taxable years, storing was done also for three business organizations which were neither producers of grain nor members of the cooperative. Fees were charged by petitioner, and received from the owners of the grain for such storage.

Grain so stored for *producers* during the taxable years was, with possibly one or two exceptions, subsequently purchased by the petitioner. If such stored grain was purchased from one of petitioner's members, he was at the time of such purchase given credit in petitioner's patronage ledger for the number of bushels which he sold; but no credit was at any time given to him in said patronage ledger, either for the number of bushels which he stored, or for the length of time that the same was stored, or for the amount of storage fees which he paid. A record was kept, however, of the identity of each person for whom grain was stored; and of the amounts of storage fees paid by such person.

As regards the grain stored for the three above-mentioned non-producer business organizations which were not members, this grain had originally been purchased by petitioner from producers, and then had been sold by petitioner to said organizations. The organizations had thereupon, at the time of so acquiring the grain, arranged to have petitioner store the same for them until such time as they might order it to be shipped out.

The amounts of storage fees (herein called "storage income") which petitioner received for storing grain from producers and from the above-mentioned organizations, were as follows:

| Year ended June 30 | Storage income received from producers | Storage income received from nonproducer organizations |
| --- | --- | --- |
| 1953 | $3,192.66 | $2,591.07 |
| 1954 | 4,071.90 | (1) |
| 1955 | 2,345.99 | (1) |

1 None.

The evidence does not establish what portions of the above storage income were received by petitioner from members of the cooperative, or from any particular member.

The kinds of grain stored, in respect of which the above amounts of storage income were received, and the percentage of said storage income attributable to each kind of grain, were:

|  | Percentage of storage income attributable to— | | |
| Year ended June 30 | Soybeans | Oats | Corn |
|---|---|---|---|
| 1953 | 0. 9487 | 0. 0510 | 0. 0003 |
| 1954 | . 945 | . 051 | . 004 |
| 1955 | . 965 | . 035 | (1) |

1 None.

All of the above amounts of storage income were included by petitioner in the "gross savings and income" of its grain department, for the purpose of computing patronage dividends.

### Facts re Computation of Patronage Dividends.

During the taxable years involved, chapter 499 of the pertinent Iowa Codes contained the following provisions applicable to farmers' cooperative associations:

499.30 *Distribution of Earnings.* The directors shall annually dispose of the earnings of the association in excess of its operating expenses as follows:

To provide a reasonable reserve for depreciation, obsolescence, bad debts, or contingent losses or expenses.

At least ten percent of the remaining earnings must be added to surplus until surplus equals either thirty percent of the total of all capital paid in for stock or memberships, plus all unpaid patronage dividends, plus certificates of indebtedness payable upon liquidation, or one thousand dollars, whichever is greater. No additions shall be made to surplus whenever it exceeds either fifty percent of such total, or one thousand dollars, whichever is greater.

Not less than one percent nor more than five percent of such earnings in excess of reserves may be placed in an educational fund, to be used as the directors deem suitable for teaching or promoting co-operation.

After the foregoing, to pay fixed dividends on stock or memberships, if any.

All remaining net earnings shall be allocated to a revolving fund and shall be credited to the account of each *member* including subscribers * * * ratably in proportion to the business he has done with the association during such year. Such credits are herein referred to as "deferred patronage dividends." [Emphasis supplied.]

Provisions of substantially the same wording were included in petitioner's articles of incorporation.

The petitioner, in computing the amounts of the patronage dividends which it excluded from gross income in its Federal income tax returns for the taxable years involved, proceeded as follows. First, as hereinafter shown, it set forth under three distinct headings the amounts of so-called "gross savings and income" (representing in substance, gross profits per books) which it had classified on its books as follows: (1) That derived from business transacted through its grain department; (2) that derived from business transacted through its merchandise department; and (3) "Other Income" which included such items as cleaning fees, and patronage dividends received from other cooperatives. It then deducted from the amount set forth under

each of these headings (in accordance with requirements of the Iowa Codes and its articles of incorporation), allocated portions of certain expenses, ordinary dividends paid on its common and preferred stock, and additions to its educational fund. The balances remaining in respect of the grain and merchandise departments represented that portion of the gross savings and income of each, which, according to petitioner's computation, would have been available for patronage dividend allocation if patronage dividends were allocable both to members and to nonmembers of the cooperative. Petitioner, however, allocated patronage dividends only to its members. Accordingly, the above-mentioned balances were adjusted, so as to reflect the portions thereof which petitioner regarded to be available for patronage dividends to members.

Patronage dividends allocated by petitioner from its grain department were computed on the basis of *bushels*, i. e.: The amount allocated to a particular member was determined by comparing the number of bushels of grain which he either had sold to petitioner or had delivered to petitioner's elevator in satisfaction of C. C. C. crop loans, with the total number of bushels so sold or delivered by all members. On the other hand, the patronage dividends allocated from the merchandise department were computed on the basis of *dollars*, by comparing the dollar amount of purchases made by a particular member, with the total dollars of purchases made by all members. No patronage dividends were allocated from the so-called "Other Income."

Petitioner's computation of the amount of patronage dividends which it excluded from gross income on its Federal income tax return for the taxable year ended June 30, 1953 (which computation is similar to that made for each of the other taxable years involved), was in substance as follows:

| | Grain department | Merchandise department | Other income | Total |
|---|---|---|---|---|
| Gross savings and income | $23,776.73 | $14,133.73 | $580.39 | $38,490.85 |
| Less: Expenses, ordinary dividends, etc., as allocated | $15,995.52 | $9,507.21 | $388.37 | $25,891.10 |
| | $7,781.21 | $4,626.52 | $192.02 | $12,599.75 |
| Eliminate: "Other income" | | | | $192.02 |
| Balance available for patronage dividends, if allocable to both members and nonmembers | $7,781.21 | $4,626.52 | | $12,407.73 |
| Bushels of grain purchased by petitioner | 412,756 | | | |
| Government grain received for account of C. C. C. (bushels) | 12,758 | | | |
| Total bushels received by grain department | 425,514 | | | |
| Dollar volume of sales of merchandise department | | $107,014.08 | | |
| Business done with members only (bushels) | 387,664 | $87,512.01 | | |
| Per cent of member business to total business | 91 | 82 | | |
| Patronage dividends excluded from gross income on petitioner's income tax return | $7,080.90 | $3,793.65 | | $10,874.55 |
| Rate for computing share per member (in cents per bushel of grain sold to petitioner or delivered for C. C. C., or in per cent of the member's purchases) | *Cents* 1.83 | *Per cent* 4.3 | | |

Amounts comparable to those shown in the last two items of the above table, as computed by petitioner for the other 2 taxable years, were:

| Patronage dividends excluded from gross income on petitioner's income tax return, for year ended June 30— | Grain department | Merchandise department | Total |
|---|---|---|---|
| 1954 | $19, 348. 53 | $7, 372. 87 | $26, 721. 40 |
| 1955 | 25, 971. 09 | 8, 020. 64 | 33, 991. 73 |

| Rate for computing share per member, for year ended June 30— | Cents | Per cent |
|---|---|---|
| 1954 | 3. 5 | 7. 4 |
| 1955 | 5. 6 | 7. 44 |

The method used by petitioner to exclude the above-mentioned amounts of patronage dividends from gross income on its income tax returns, was to add the patronage dividends for each year to its cost of goods purchased. This effected an increase in its cost of goods sold, and a corresponding decrease in its gross profit from sales.

The respondent, in his notice of deficiency, determined that the amount of patronage dividends excludible from petitioner's gross income for each of the taxable years was less than the amount excluded by petitioner on its returns. In computing such reduced amounts, he made the following adjustments relating to the grain department which are here in dispute: He eliminated from the gross savings and income of the grain department, for the purpose of computing patronage dividends, all compensation received from the C. C. C. for handling and storing Government grain, and all compensation received from persons and organizations other than the C. C. C. for storing grain owned by them; and he included these eliminated items in the category of "Other Income," in respect of which no patronage dividends were allowed. As a complementary adjustment in computing the portion of the grain department business transacted with members, he eliminated all Government grain both from the total bushel-volume of business and also from the total bushel-volume of member business. Further, he reduced the amounts deducted from the gross savings and income of the grain department for expenses, ordinary dividends, and additions to the educational fund.

### OPINION.

The issues here presented involve the right of an Iowa corporation (which at all times material operated under the laws of said State as a farmers' cooperative association, but which concededly did not qualify for exemption from Federal income tax)[3] to exclude from its

---

[3] Section 101 (12) of the 1939 Code and section 521 of the 1954 Code grant limited exemption from Federal income tax to certain farmers' cooperative associations which allocate patronage dividends, refunds, or rebates for the benefit of *all* their patrons, including both members and nonmembers. Petitioner concedes that it does not qualify for tax

gross income for Federal income tax purposes, as part of its "patronage dividends," amounts allocated out of certain portions of its earnings for distribution to "members" only. Such portions of its earnings consisted of compensation received for services in handling and storing grain; they were for the most part received from nonmembers of the cooperative; and they were not allocated in proportion to the amounts of storage business transacted with the members for whom the allocations were made. Since this is a problem of Federal taxation, it is controlled by Federal law. *Burnet* v. *Harmel*, 287 U. S. 103, 110. Thus, notwithstanding that the Iowa Codes provided *how* and *to whom* the earnings of a cooperative association, such as petitioner, should be distributed, we must look to the provisions of the pertinent Internal Revenue Codes, and to Federal court decisions and administrative rulings relative to the application of such Codes, in deciding what if any portions of said earnings are not subject to Federal income tax.

Neither the 1939 Internal Revenue Code nor the 1954 Code provides specifically for the exclusion or deduction of patronage dividends, refunds, or rebates, by a non-tax-exempt cooperative. However, it has been the administrative practice of the Treasury Department and its Internal Revenue Service, for many years, to exclude true patronage dividends of nonexempt cooperatives, under certain conditions. I. T. 1499, I–2 C. B. 189, 191 (1922) ; A. R. R. 6967, III–1 C. B. 287 (1924) ; S. M. 2595, III–2 C. B. 238 (1924) ; G. C. M. 12393, XIX–2 C. B. 398 (1933) ; G. C. M. 17895, 1937–1 C. B. 56; I. T. 3208, 1938–2 C. B. 127; Rev. Rul. 57–59, 1957–1 C. B. 24. And such administrative practice is recognized, at least indirectly, both in section 101 (12) (B) of the 1939 Code and in section 522 (b) (2) of the 1954 Code, wherein it is stated: "Patronage dividends, refunds, and rebates *to patrons with respect to their patronage* * * * shall be taken into account in computing net income [of an *exempt* cooperative] in the same manner as in the case of a cooperative association not exempt."

The propriety of such administrative practice in allowing exclusions for patronage dividends to nonexempt cooperatives, in the absence of any specifically expressed statutory authority, was questioned by the Court of Appeals for the Ninth Circuit in *Cooperative Oil Association, Inc.* v. *Commissioner*, 115 F. 2d 666, affirming a Memorandum Opinion of this Court. However, the Treasury Department and its Internal Revenue Service have adhered to such practice, on the theory that true patronage dividends are, in reality, either (a) additions to the prices initially paid by the cooperative to its patrons for products which the

exemption under these sections, because it provides patronage dividends only for those of its patrons who are members of the cooperative. Accordingly, petitioner files corporate income tax returns (Form 1120) ; and it concedes that its net income is subject to Federal income tax under sections 13 and 15 of the 1939 Code and under section 11 (b) and (c) of the 1954 Code.

patrons had marketed through the cooperative, or (b) refunds to patrons of part of the prices initially paid by them for merchandise or services which they had obtained through the cooperative. Thus, the administrative practice is to treat true patronage dividends as *corrective and deferred price adjustments*, which serve to reduce the amount of the cooperative's gross profit from sales, and which actually never became part of its gross income. I. T. 3208, *supra* at 128. This administrative practice, and the theory on which it is based, have been recognized and approved by this and other courts. *Clover Farm Stores Corporation*, 17 T. C. 1265, 1277; *Dr. P. Phillips Cooperative*, 17 T. C. 1002, 1010; *United Cooperatives, Inc.*, 4 T. C. 93, 106; *Midland Cooperative Wholesale*, 44 B. T. A. 824, 830; *Fruit Growers Supply Co.*, 21 B. T. A. 315, 326, affd. 56 F. 2d 90; and *Farmers Cooperative Co.* v. *Birmingham*, (N. D. Iowa) 86 F. Supp. 201.

The judicial authorities and administrative rulings indicate that, in order for an allocation of earnings by a cooperative association to qualify as a true corrective and deferred price adjustment, and hence as a true patronage dividend, at least three prerequisites must be met: First, the allocation must have been made pursuant to a preexisting legal obligation; that is to say, it must have been made pursuant to a legal obligation which existed at the time when the participating patrons transacted their business with the cooperative, and not pursuant to an obligation created after the allocated amount was earned.[4] *Southwest Hardware Co.*, 24 T. C. 75, 82. Second, the allocation must have been made out of profits or income realized from transactions with the particular patrons for whose benefit the allocations were made, and not out of profits or income realized from transactions with other persons or organizations which were not entitled to participate in such allocations. *Clover Farm Stores Corporation*, *supra* at 1277; *Valparaiso Grain & Lumber Co.*, 44 B. T. A. 125, 126, 127; Regs. 45, art. 522; I. T. 1499, *supra;* A. R. R. 6967, *supra;* S. M. 2595, *supra;* G. C. M. 12393, *supra;* Rev. Rul. 57–59, *supra.* And third, the allocations must have been made equitably; so that profits realized on the one hand from selling merchandise or services to patrons, and those realized on the other hand from marketing products purchased from patrons, were allocated ratably to the particular patrons whose patronage created each particular type of profit. See I. T. 1499, *supra;* I. T. 3208, *supra; Clover Farm Stores Corporation*, *supra; Farmers Cooperative Co.* v. *Birmingham*, *supra.* See also, George J. Waas and Daniel G. White, "Application of the Federal Income Tax Statutes to Farmers' Cooperatives," Farm Credit Administrative Bulletin No. 53 (November 1942), p. 70.

---

[4] The parties have stipulated that, in the instant case, this prerequisite has been met.

With further regard to the second and third of such prerequisites, it is to be observed that the only references to patronage dividends of cooperatives, made in the Internal Revenue Codes of 1939 and 1954, indicate that the principles governing the allowance of such patronage dividends are the same, in the case of tax-exempt cooperatives and in the case of nonexempt cooperatives; for, as hereinbefore noted, section 101 (12) (B) of the 1939 Code and section 522 (b) (2) of the 1954 Code each provides that, "[p]atronage dividends, refunds, and rebates to patrons with respect to *their patronage* * * * shall be taken into account in computing the net income [of a tax-exempt cooperative] in the *same manner* as in the case of a cooperative not exempt." (Emphasis supplied.) And, under section 101 (12) (A) of the 1939 Code and section 521 of the 1954 Code, the only tax-exempt cooperatives to whom allowances for patronage dividends may be made, are those which, in respect of their marketing activity, turn back to their marketing patrons the net profits of such activity, "on the basis of either the quantity or the value of the products furnished by them"; or which, in the case of their activity in selling supplies and equipment to their patrons, turn over such supplies and equipment "to *them* at actual cost, less necessary expenses."

We have found no statutory or judicial authority, and no published ruling of the Internal Revenue Service, which would warrant the allowance of patronage dividends to a nonexempt cooperative association, other than in accordance with the foregoing principles. All of the authorities relied upon by petitioner to support a contrary position are distinguishable; principal among such authorities are: *Greene County Farmers Sales Association* v. *United States*, (Ct. Cl.) 55 F. Supp. 123; and an unpublished letter from a deputy commissioner of internal revenue to a taxpayer, other than petitioner, which is quoted in petitioner's brief. In the *Greene County* case, the Court of Claims held that, notwithstanding the taxpayer had been authorized to act as a cooperative, it "was not a cooperative, but a corporation organized for profit"; that "the persons to whom the rebates were paid were not 'members'" of the taxpayer; and that "cases dealing with farmers' cooperative associations * * * are inapplicable." Furthermore, two dissenting judges concluded that the rebates involved represented distributions of profits to a selected group of customers, out of that portion of its net income remaining after payment of an 8 per cent dividend to stockholders; that "[t]he taxing acts do not authorize deductions of such distributions in determining taxable income"; and that "[c]laimed deductions from net income which are not authorized specifically, either by the revenue acts or by any regulation applying to them, cannot be allowed."

As regards the above-mentioned letter of the deputy commissioner, this has never been officially published so as to constitute an official

ruling, but represents merely advice given to a particular taxpayer (other than the petitioner) in respect of particular facts represented by such taxpayer. Such represented facts are not clearly shown in the quotation from such letter, which is set forth in petitioner's brief; and petitioner has not shown that such facts are on all fours with those in the instant case. In any event, advice given to a particular taxpayer in an unpublished ruling of such character has no binding effect on the respondent; and it cannot be deemed to have overturned the long-established administrative practice of the Treasury Department and its Internal Revenue Service, as disclosed in the published official rulings hereinabove cited.

Applying the principles established by the authorities which we have hereinabove cited to the facts of the instant case, we reach the following conclusions:

1. *Allocations made for members only, out of compensation received from Commodity Credit Corporation for services in handling and storing Government grain.*—The Commodity Credit Corporation was not a member of the petitioner cooperative; and none of petitioner's patronage dividends were allocated for its benefit. The grain which petitioner stored on behalf of said Government agency was owned by the agency throughout the period of its storage and at all times after it had been delivered to petitioner's elevator in satisfaction of Government crop loans. Such Government grain was at no time included by petitioner in its inventory, and was not marketed by petitioner for anyone. Also, all of the compensation which petitioner received for its services in handling and storing this grain was paid by said Government agency, pursuant to specific contracts existing between petitioner and either the C. C. C. or the county committees which represented said agency. None of such compensation was paid to petitioner by any of its members.

In view of the foregoing, it is obvious that the allocations made by petitioner for its members only, out of such compensation, did not and could not represent *corrective and deferred price adjustments* to members, in respect of any grain purchased by petitioner from such members, or in respect of any storage charges paid by them. Accordingly, as regards the allocations made out of Government grain income, petitioner failed to meet the second of the prerequisites above mentioned; and the amounts so allocated do not qualify as true patronage dividends.

Petitioner contends that such allocated amounts were true patronage dividends, to the extent that the Government grain was *produced* by its members. It has cited no authority in support of such position; and our examination of the authorities has revealed no such support, either statutory or judicial. The determinative factors, in our opinion, are who owned the grain which was handled and stored, and who

paid the charges for these services. We regard it to be wholly immaterial who may have originally produced such grain; or who may have owned it prior to the time when it was surrendered to the C. C. C., and was then handled and stored for such agency, as such agency's property and at its expense.

We hold that the amounts allocated by petitioner to its members only, out of the compensation which it received from the C. C. C. for handling and storing Government grain, are not excludible from petitioner's gross income, as part of its patronage dividends. We approve the determinations of the respondent as to this issue.

2. *Allocations made for members only, out of compensation received from persons and organizations other than the Commodity Credit Corporation, for storing grain owned by them.*—The compensation received by petitioner from persons and organizations other than the C. C. C. (including both members and nonmembers), for storing grain owned by such persons and organizations, was of three classes: (1) Part of such compensation was received from three business organizations which were neither producers of the grain nor members of the petitioner cooperative; (2) another part was received from non-member-producers; and (3) the remainder was received from member-producers.

As regards the first two of these classes of compensation, they are similar to the compensation received from the C. C. C. above mentioned; for these also represent compensation for services rendered to, and paid for by, nonmembers of the cooperative. As to these, we hold, consistent with our above holding, that the allocations do not qualify as true patronage dividends; and that the same are not excludible from petitioner's gross income.

As to the third class of compensation above mentioned, this represents amounts received by petitioner from its members, for storing grain owned by such members. It is our opinion that, under the principles above stated, allocations out of such compensation, if made equitably to the *particular* members from whom the compensation was received, would qualify as true patronage dividends.

Petitioner, however, allocated the compensation falling within this third class, not with regard to the amounts of storage business transacted with the particular members for whose benefit the allocations were made, but rather with respect to the number of bushels of grain which its members had delivered to its elevator, either for purchase by petitioner or for surrender to the C. C. C. in satisfaction of Government crop loans. The particular members with whom this storage business was transacted are not shown to compose the entire group of members who delivered grain to petitioner's elevator for the other purposes above stated. Indeed, over 94 per cent of the stored grain consisted of soybeans; while, on the other hand, most of the grain

delivered to petitioner's elevator for the other purposes above mentioned was corn. Also, the amounts of business done by these two groups of members have not been shown to have produced profits which were allocable at the same rates. Accordingly, the petitioner, in making the allocations out of the third class of storage income, failed in part to meet the third prerequisite above mentioned.

We hold that the amounts allocated to members only, out of compensation received from members for storing grain owned by them, are excludible from petitioner's gross income as part of its patronage dividends, only to the extent that the amounts which were allocated to the particular members who stored grain, represented their proportionate shares of total member storage business which produced the compensation of such class, less the necessary expenses applicable thereto.

*Decision will be entered under Rule 50.*