**CHICAGO & W. I. R. CO. v. CHICAGO & E. R. CO (two cases).**

**GRAND TRUNK WESTERN R. CO. v. CHICAGO & W. I. R. CO. et al.**

**PETTIBONE et al. v. CHICAGO & W. I. R. CO. et al.**

Nos. 7875–7877.

Circuit Court of Appeals, Seventh Circuit.
March 17, 1943.

Rehearing Denied Jan. 21, 1944.
See 140 F.2d 130.

John C. Slade, Frank H. Towner, and Bryce L. Hamilton, all of Chicago, Ill., and H. V. Spike, of Detroit, Mich., for Grand Trunk Western R. Co.

Elmer W. Freytag, of Chicago, Ill., for receivers of Wabash Ry. Co.

K. L. Richmond, Arthur M. Cox, and Frederic H. Stafford, all of Chicago, Ill. (A. F. Reichmann and Andrew J. Dallstream, both of Chicago, Ill., of counsel), for Chicago & Eastern Ill. R. Co.

J. R. Barse, Ernest S. Ballard, and Francis H. Uriell, all of Chicago, Ill., for Chicago & Western Indiana R. Co.

Clyde E. Shorey, Robt. W. Schupp, and Frederic Barth, all of Chicago, Ill., for Chicago & Erie R. Co.

Cope J. Hanley, and B. G. Stackhouse, both of Chicago, Ill., for Trustees of Chicago, I. & L. Ry. Co.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

EVANS, Circuit Judge.

These four appeals were consolidated for presentation. They raise somewhat similar questions. Three, Nos. 7875-7, may be disposed of in one opinion. The appeal in No. 7878 must be separately considered and will be treated in a separate opinion. Chicago & Erie R. Co. v. Chicago & Western Indiana R. Co., 140 F.2d 126.

Generally speaking, all the appeals involve the distribution of the obligations and the maintenance and operating expenses of the Chicago and Western Indiana Railroad Company, herein called the Western Indiana, which was organized in 1879, to provide terminal facilities for use by such railroads as might become its lessees. Western Indiana holds the legal title to what is known as the old part of the Dearborn Street passenger station, and general facilities, with the land, and approximately 25 miles of first or main-line railroad tracks and other tracks called second, as well as other property.

It entered into 999 year leases with five lessees: (1) Chicago and Erie Railroad Company, here called the Erie, appellant in No. 7878; (2) The Grand Trunk Western Railroad Company, here called the Grand Trunk, appellant in No. 7875; (3) The Chicago, Indianapolis and Louisville Railway Company, here called the Monon, appellant in No. 7876; (4) The Chicago and Eastern Illinois Railroad, herein called the Eastern Illinois, and (5) The Wabash Railway Company; hereinafter called the Wabash. The two last-named lessees are the real adversary parties to appellants in Nos. 7875 and 7876. The other lessees oppose Erie in its contentions in No. 7878.

Western Indiana is appellant in appeal No. 7877. It seeks instruction and guidance in making its future rental charges.

The litigation started as a so-called friendly suit, brought by Western Indiana, against Erie, to recover what Western Indiana alleges, and Erie denies, is rental due as Erie's unpaid, proportionate share of certain costs and expenses incurred by Western Indiana during the period, April 1, 1933, to December 31, 1938.

Allegedly due on this amount was $114,071.14. Erie denied all liability and filed a counterclaim, alleging that it had overpaid its share of the rentals and sought judgment for the amount of said overpayment, amounting to $126,852.72 on the so-called management issue and for $121,804.97 on the disputed rental issue.

Erie also is a stockholder of plaintiff. It assails Western Indiana's action in refusing to curtail certain suburban services which it is operating at a loss of $100,000 a year, after five of the six directors of plaintiff's board voted in favor of curtailment.

Erie's counterclaim against Western Indiana caused the latter to bring in the Grand Trunk, the Monon, the Eastern Illinois, and the Wabash, and ask the court to adjudge and declare the rights and liabilities of all such parties with respect to Western Indiana's operating and working expenses under the various leases to these parties. It also sought a declaratory judgment which would be its guide for distribution of its future rental charges. The new parties defendant deny liability. Grand Trunk and Monon each filed cross claims and counterclaims and asked for an accounting. All the bars were now down. The litigation provided a field day for all parties who entered their favorites,—dark horse grievances.

A further statement of the issues can best be understood if a short resumé of the Western Indiana's history and activities is given. Organized in 1879, for the purpose of constructing a line of railway from Indiana State Line and also from Dolton, Illinois, into the City of Chicago, and there providing terminal facilities for use in common by Eastern Illinois and such other railroads as might become its lessees, the first stage of its construction was completed in 1880, since which time it has been the owner of a terminal in Chicago and two main lines of tracks between this terminal and the State Line near Hammond, Indiana, and the other at Dolton, Illinois. In addition to these two short main lines, Western Indiana owns "tracks, switches, turnouts, side tracks,

yards, stations, appendages, and terminal facilities" comprising what is known as its "common property."

Since 1880, additions and betterments to the common property in the way of improvements have been made. It has raised its tracks; it has also acquired what is known as the Belt Division and also various tracks, yards, and facilities not included in the "common property."

Between October, 1879 and December, 1881, Western Indiana granted five, generally similar, leases, each for 999 years to the five above-named lessees, or their predecessors. The first lease was to Eastern Illinois. Each lease granted exclusive right to use certain described portions of the terminal property and also the right to use, in common with Western Indiana and such other company or companies as might obtain from Western Indiana the grant of similar rights, all the specified portions of the main tracks, passenger depot, and appurtenances.

The lease to Eastern Illinois gave it the exclusive right to conduct the entire local business between Chicago and Dolton. The lease to Erie gave Erie a similar right to the local business between Calumet River and Hammond, Indiana.

Each lease provided that each lessee should pay $5 per year, and such sum as would pay the interest upon the Western Indiana's mortgage and provide sinking funds for the payment of the principal in 35 years from January 1, 1885. Said lease also provided for the lessee's paying taxes and assessments, as well as all expenses of maintenance, management, and operation.

The different bases of rent payment are what has led to conflicts, disputes, and to litigation. Four times these disputes have reached this court. 131 F.2d 215; In re Chicago & E. I. R. Co., 94 F.2d 296; Chicago & W. I. R. Co. v. Chicago & E. I. R. Co., 86 F.2d 441; Grand Trunk W. R. Co. v. Chicago & E. I. R. Co., 141 F. 785.

Each time a different phase of the ever-hot and burning controversy was involved.

Rental payments were determined in one of two ways: either on the basis of use which was measured by the ratio of engine and car use of the property by one lessee to the total engine and car use of all five lessees. This was called the wheelage basis. The other rental called for payment by each lessee equally.

While the Western Indiana was originated as an independent venture, the stock of the company was soon acquired by the five lessee railways, each of which owned 20%. Such ownership has continued in the same ratio since 1882. About that same date an agreement was made, known as the 1882 Inter-Tenant Agreement, which provided that Western Indiana should exclusively manage and control all the property used by Western Indiana and its five lessees; should furnish at cost all facilities and perform all services required by it and as defined in the Inter-Tenant Agreement. Some expenses were to be distributed on the wheelage basis. Other expenses were to be borne equally by the owner-tenants. For exact coverage, read the provisions hereafter quoted.

The original bond issue was supplemented by a new bond issue when a new passenger station and additional track were constructed and numerous betterments were made which resulted in a new agreement executed in 1902, the terms of which and their effect on the 1882 Inter-Tenant Agreement are of large, if not determinative, importance in the disposition of these appeals. A new consolidated mortgage for $50,000,000 was negotiated. The five lessees executed an agreement which provided for the issuance of the mortgage and bond issue and "for the execution of new contracts of leasing," all to be embodied in one document. The joint supplemental lease bore date, July 1, 1902, and carried into effect this preliminary agreement of the tenants. It provided for the refunding of the bond issue, the payment of rentals, and other matters of no particular importance in this case.

One paragraph of large importance is No. 33. It is set forth in the margin.[1]

---

[1] "33. Operating Expenses Divided on Wheelage] Eleventh. That after the date hereof the lessor shall exclusively manage, operate and maintain every portion of the common property; and the entire cost of the management, operation, maintenance, repair and renewal of, and of all taxes, liens, water rents and assess- ments on, said railroad, buildings and facilities, the common use of which is reserved to the parties hereto, and the entire cost of the management, operation, maintenance, repair and renewal of, and all taxes, liens, water rents and assessments on, all enlargements and improvements thereof and additions thereto and

Beneath it is paragraph 6 of the Inter-Tenant Agreement of 1882.[2] These two afford the *pièce de résistance* of this suit.

Since 1902, additional bonds have been issued and the lessees have, through additional leases, obligated themselves to pay additional rental, that interest and principal on the bonds may be always paid.

The property of Western Indiana is used in part by other railroads. At the present time they are three in number,—the Belt Railroad, the Atchison, Topeka and Santa Fe Railway Co., and the Elgin, Joliet and Eastern Railway Company. It has also rented properties, nine parcels, paying therefor, $90,084.25 per year.

The business of the five-owner-lessees developed somewhat differently, and the rental payments on the wheelage basis began to vary. As a result, it became a matter of advantage to one tenant to pay its rental on the wheelage basis, while to another, an advantage lay in payment on an equal basis.

A by-law of Western Indiana provided:

"A. In the management and control of the railroad and property of the Company which is used in common by the present five railway company lessees thereof, * * * and in the establishment and enforcement of rules and regulations for the use of said railroad property, it shall be necessary to secure the *unanimous* approval of said railway company lessees."

Various efforts to effect a compromise were defeated by the spokesmen of one or more tenants. Auditors and Committees of Advisors made reports as to the correct method of determining whether an item fell within the wheelage proviso, but all reports came to naught for want of unanimous approval. The lessee or lessees who were benefited by the prevailing method of distributing expenses blocked all possible proposed settlements and attempted clarifications. The lessor was not consistent or uniform in its rulings. In one instance a substantial item was allocated first on a wheelage basis, then on an equal basis, then back to the wheelage basis.

The items which are involved in the appeal of Grand Trunk and Monon, are four in number: (1) disputed rentals; (2) the Grand Trunk payment; (3) Western In-

---

on and to any other railroad hereafter acquired by the lessor for the common use of the parties hereto, shall be borne by said lessees in the proportion of their several wheelage uses of the various portions of said railroad to the total wheelage use thereof; and for the purpose of distributing such cost, the lessor shall divide by lines across and at right angles with its right of way, its said railroad and property, including all appurtenances, into such sections as may be necessary in order to equitably distribute such cost of the management, operation, maintenance, repair and renewal of, and all taxes, liens, water rents and assessments on, said several sections among the parties of the second part in proportion to their respective wheelage uses of such sections; and it may, from time to time, change such sectional divisions the better to subserve the purpose and intent aforesaid."

2 "6th. The term, 'working expenses,' as used in this agreement, shall include all taxes and assessments, ordinary and extraordinary, against the property of the Western Indiana Company, except that leased as aforesaid to the said Belt Railway Company, and property leased, or that may be leased, exclusively to one of the parties of the second part, or some other company or person; the cost of maintaining, repairing and renewing its railroad, tracks, buildings and other property, in the common use of the parties of the second part; the expense of providing and maintaining gates, signals, semaphores and lights, and of complying with any and all requirements that may be imposed by national, state or municipal authority; the expense of all service which the Western Indiana Company may have to employ; the cost of maintaining its corporate organization, and of protecting and defending its property, including suitable insurance thereof; all judgments against the Western Indiana Company and the expense of litigation, and *all other claims and demands of every name, nature and description,* for which the Western Indiana Company may be legally liable, excepting its mortgage debt and the interest thereon, and excepting therefrom, and from all the provisions of this paragraph, such claims and demands as, under this agreement, or the leases and supplemental leases between the Western Indiana Company and the several parties of the second part, should be paid exclusively by one of the parties of the second part. The cost of permanent improvements and of additions to the Western Indiana Company property shall not be deemed to be included in the term 'working expenses' as used in this paragraph." (Italics ours.)

diana's separate railroad operations; (4) miscellaneous charges and expenses.

(1) The Western Indiana leased nine pieces of property and paid rental therefor. The largest rental item was $48,718.-72, paid annually to Santa Fe. For the remaining eight parcels, a rental of $41,-365.72 was paid to the five shareholder-lessees in different amounts.

(2) An annual payment of $20,665.35 by Western Indiana has been made to Grand Trunk since July 1, 1902, and was to continue until "Grand Trunk shall use lessor's road south of 49th Street." (Such use by Grand Trunk has not occurred.) This agreement and payment were the result of certain cancelled provisions in the 1891 lease to Grand Trunk.

(3) Lessor incurred expenses for two services—suburban passenger train service and freight switching. Both are conducted on the common property. The expenses have been heretofore paid out of lessor's income. In other words, they have not been billed separately to and paid by the lessees.

(4) Charges and expenses for "Foreign Freight Cars—Per Diems, Reclaims, and Repairs; Illinois Franchise Tax; Federal Income Tax; Miscellaneous Taxes; Work Equipment—Insurance, Depreciation and Repairs; Expenses on Funded Debt; and Taxes on Surplus Property."

The contested question in each case turns on the query,—How should these expenses be distributed, on a wheelage basis, or equally?

Preliminary questions which are advanced by opposing counsel must first be met.

■ Much weight is given by Grand Trunk and Monon to the decision of this court in a case (94 F.2d 296) brought to determine whether certain capital stock taxes should be distributed upon the wheelage basis. Without discussion, we accept, not because of any doctrine of *stare decisis,* but rather because of the strength and merit back of the reasons and conclusions, that part of the opinion which holds that the lessees are not bound or estopped by their payments to the lessor nor is the lessor bound by its construction of the contract and method of distribution of expenses.

The venture of the lessor and lessees was quite similar to, if indeed it was not, a joint venture. The many items of expenses of the lessor necessitated prompt payments by the lessees. Adjustments could be, and were, made by both sides. None of the parties ever made their payments as a settlement of a stated account. In fact, the lessor occupied somewhat the position of a trustee. Grand Trunk Ry. Co. v. Chicago & W. Ind. R. Co., 7 Cir., 131 F.2d 215.

■ We are also convinced that if the Inter-Tenant Agreement of 1882 governs, the items here in dispute are chargeable to tenants on the usage or wheelage basis.

Supplementing the reasons given by the court in the capital stock tax case, we find much justice and persuasive reason back of such an allocation. When the five roads, which were to use these terminal facilities of Western Indiana, concluded to embark on this enterprise and to purchase the property, each contributed the same sum and each took 20% of its stock and each acquired a lease with the right to use the common property for a period of 999 years. Each was to pay a rental to cover the charges.

The difficult task of distributing the expenses and charges arose. It was to be done as rentals. Being equal owners, the parties might have provided for carrying the burden of all expenses, equally. Likewise, the burden could have been distributed among the owner-tenants on the basis of their use of the property. The parties adopted neither in whole and both in part. This not only would appear to be the fair way, but the parties so believed and settled the matter by their written agreement. This was in 1882.

As the five roads' businesses increased and the Chicago terminal became more important and valuable, costly improvements and betterments were required. In twenty years this led to the flotation of a $50,000,000 mortgage and the execution of an agreement to give assurance of interest and refunding payments and to make the bonds sufficiently attractive to insure a low rate of interest.

The fundamental basis for distribution of Western Indiana's costs, however, remained the same. The tenant was to pay in accordance with the extent of his use, save where the investment improvement and some similar items justly required the owners to pay according to their holdings in the company's equity.

Concluding as we do that all four items, rental, Grand Trunk payments, Western Indiana's separate railroad operation, and each miscellaneous charge and expense, would, under the agreement of 1882, be items for which the lessees should pay on a user or wheelage basis,[3] we come to the seriously argued question in the case. It is the ground upon which appellees must rely in order to prevail, i. e., the cancellation (or abrogation) of the 1882 agreement by the 1902 agreement.

Appreciating the importance of this fact, the District Court met the question squarely and, by its 3rd conclusion of law, declared provision of paragraph 9 of the Preliminary Proprietary Agreement and paragraph 33 of the Joint Supplemental Lease of July 1, 1902, "superseded and abrogated paragraphs 5 and 6 of the Inter-Tenant Agreement of November 1, 1882," and the various provisions in prior leases, etc. The District Court concluded that the Inter-Tenant Agreement of 1882 and the 999 year leases, so far as they provided for rental on a wheelage basis, were cancelled and the new agreement narrowed in scope the services for which rental on a use or wheelage basis was payable.

Grand Trunk and Monon contend that this is at variance with the decision of this court in the capital stock tax case. They also argue that this conclusion is in direct contradiction to the provision of paragraph 37 of the 1902 agreement, which reads:

"That nothing herein contained shall in any way alter, impair, or affect said existing leases, or any or either of them, or any matter or thing therein, except as herein otherwise specifically provided."

It would have been easy for the parties to have expressly cancelled the rent provisions of the leases and particularly paragraphs five and six of the Inter-Tenant Agreement of 1882, if such were the agreement of the parties. Instead, however, the 1902 agreement, which appellees rely on as a cancellation of the 1882 agreement, expressly provides that the existing leases were in no way *altered, impaired or affected,* "except as. herein otherwise specifically provided."

An agreement referred to by counsel and by the District Court, which preceded the execution of this 1902 agreement, was called the "Preliminary Proprietary Agreement." It was executed, January 16, 1902, and obtained its name, Preliminary, because it was the forerunner,—the basis—of the ultimate agreement into which it merged when the 1902 agreement was executed, July 1, 1902. It added nothing to the terms or the effect of said July 1, 1902 agreement. Consequently there is presented only the effect of the 1902 agreement on existing leases. The same question was before us in the capital stock tax case.

In view of the express provision above quoted, to the effect that no impairment, no alteration, and no effect of existing leases occurred by virtue of this, the 1902 agreement, "except as herein otherwise specifically provided," we · must reject the contention that there was "a cancellation" or "an abrogation" of paragraphs 5 and 6 of the 1882 agreement by the July 1st, 1902 agreement.

This conclusion being inescapable, we must read and give effect to paragraph 33 to ascertain the extent that the existing leases were by it otherwise specifically superseded.

In describing the working expenses for which the parties were liable on a wheelage basis, paragraph 6 of the 1882 agreement provides:

"The term, 'working expenses,' as used in this agreement, shall include * * * all judgments against the Western Indiana Company and the expense of litigation, *and all other claims and demands of every name, nature and description,* for which the Western Indiana Company may be legally liable, excepting its mortgage debt and the interest thereon, and excepting therefrom, *and from all the provisions of this paragraph, such claims and demands as, under this agreement, or the leases and supplemental leases between the Western Indiana Company and the several parties of the second part, should be paid exclusively by one of the parties of the second part.* * * *" (Italics ours.)

This italicised provision does not appear in paragraph 33 of the 1902 agreement. Specifically, the question is,—Should we, in view of paragraph 37 (1902 agreement) heretofore quoted, which retained in full force and effect every provision of the existing leases ("or matter or thing therein") not "herein otherwise specifically provided," hold that this provision of paragraph 6 was cancelled? We had occasion to dis-

---

[3] For a telling statement of the reasons why we so conclude, see Judge Lindley's opinion in 94 F.2d 296.

cuss the same subject in the capital stock tax case and concluded that this agreement, appearing in paragraph 6, remained intact after the 1902 agreement. We can not see how any different conclusion could have been reached. Paragraph 37 of the 1902 agreement expressly covers the situation. The quoted agreement appearing in paragraph 6 does not come within the exception of paragraph 37. It therefore clearly follows that the lessees are all bound by the above-quoted provision of section six and must pay the expenses, such as rent and other items which are the subject of this litigation, on a wheelage basis.

In disposing of this case we have given scant attention to the application of the doctrine of *stare decisis*. We have expressed our views on the effect to be given to the rules of *stare decisis*, "law of the case," and *res adjudicata* in Luminous Co. v. Freeman Co., 7 Cir., 3 F.2d 577, 578. Counsel for appellants in Nos. 7875-6 have insisted that this case is governed by the decision of this court in In re Chicago & E. I. R. Co., 94 F.2d 296.

It is not to be understood that we are indifferent to the rule of *stare decisis*. In view of the earnest contention of the parties, their relations to each other, the evident desire of Western Indiana and at least some of the other lessees, to keep this large and important venture operating justly and fairly, we have felt it wise to reconsider the questions and, irrespective of the capital stock tax decision, reach an independent conclusion.

Our conclusion is that paragraph 37 of the 1902 agreement is express and explicit in its terms. That paragraph makes it impossible for us to conclude that the agreement of 1902 abrogated the previous existing agreements or rights of the lessees. On the other hand, that paragraph expressly sustained all existing contract rights not specifically changed. Among such rights was the lessees' right to have certain expenses paid on the wheelage basis. Included within the terms of the provision which called for payment on wheelage basis was "any and *all other claims and demands of every name*, nature and description for which the Western Indiana Company may be legally liable."

The decree of the District Court is reversed with directions to enter one in accordance with the conclusions expressed in this opinion. The Western Indiana should be granted a decree instructing it to al-locate expenses in so far as the items here involved are concerned, among the lessees on a wheelage basis. The decree to be entered should provide that Western Indiana should restate its account charging some of the lessees with the difference between what they have paid and what they should pay on a wheelage basis, and crediting others with the difference between what they have paid on an equal basis, and what they should have paid on a wheelage basis. The decree will be subject to a further modification if there be any alteration or change in the method of apportioning expenses to be distributed on a wheelage basis if the appeal in No. 7878, Chicago & Erie Railroad Co. v. Chicago & Western Indiana R. Co., necessitates or directs a modification of existing methods.