Chicago and Western Indiana Railroad Company v. Commissioner.
Chicago & W. I. R. Co. v. Commissioner
Docket No. 71833.
United States Tax Court
T.C. Memo 1961-103; 1961 Tax Ct. Memo LEXIS 258; 20 T.C.M. (CCH) 479; T.C.M. (RIA) 61103; March 31, 1961
Charles F. Marquis, Esq., 38 South Dearborn St., Chicago, Ill., and Neil McKay, Esq., for the petitioner. Julian L. Berman Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in petitioner's income tax for 1950 and 1951 in the amounts of $361,191.04 and $326,882.60, respectively. Respondent concedes that a deficiency determined *259 for 1949 was erroneous. The issues are: (1) Did petitioner fail to include in income the amounts of $1,038,403.65 for the taxable year 1950 and $682,339.63 for the taxable year 1951; (2) has respondent changed his position in such a manner as to change the burden of proof from petitioner to respondent? Findings of Fact Some of the facts and contents of documents are stipulated and are so found. Petitioner is a corporation incorporated under the laws of the State of Illinois on January 26, 1882 by the merger and consolidation of three pre-existing corporations. Petitioner keeps its accounts in conformity with the standard classification of accounts prescribed by the Interstate Commerce Commission to whose jurisdiction it is subject. It keeps its books and files its Federal income tax returns on an accrual calendar year basis. It filed its corporate Federal income tax returns for the years 1950 and 1951 with the collector of internal revenue for the first district of Illinois. Petitioner issued its outstanding 50,000 shares of voting common stock, par value $100 per share, equally to five railroad corporations: Chicago and Eastern Illinois Railroad Company (C. & E. I.) Chicago, *260 Indianapolis and Louisville Railway Company (Monon) Erie Railroad Company (Erie) Grand Trunk Western Railroad Company (Grand Trunk)
Wabash Railroad Company (Wabash) hereinafter collectively called shareholders. Petitioner owns a multiple track terminal railroad system in and around Chicago, Illinois, consisting of approximately 574 miles of track. Approximately 154 miles are classified as main tracks and approximately 420 miles are yards and sidings. The system provides terminal facilities and other services for the freight and passenger trains of its five shareholders. Petitioner leases approximately 53 miles of its main track and 310 miles of yards and sidings to the Belt Railway Company of Chicago (hereinafter called Belt) pursuant to a lease entered into on November 1, 1912 and supplemented over the years to include additions to the leased property. Petitioner's properties are divided into two major divisions. The portion leased to Belt is known as "Belt Division" and the balance is known as "Terminal Division." Under agreements entered into between the years 1879 and 1881 as supplemented through the years, each of the shareholders or their predecessors acquired the *261 right to use petitioner's Terminal division for a term of 999 years. Terminal division provides freight and terminal facilities primarily for shareholders which use it for a large part of their freight and all of their passenger business to and from Chicago. It is divided into "common property" used jointly by shareholders, petitioner, and others, and "exclusive property" leased to and used solely by specified shareholders. Belt, in addition to its lease of Belt division, has trackage rights over 18 miles of Terminal division. The Atchison, Topeka & Santa Fe Railway Company (hereinafter called Santa Fe) uses the Dearborn Station and the approach track for a 999-year term under agreements pursuant to which it pays annually $70,000, and a share, based on wheelage use, of operating expenses and taxes with respect to the property. Under a year-to-year lease Santa Fe pays an additional $15,000 annually with respect to improvements made to the Dearborn Station. Under a long-term lease the Elgin, Joliet and Eastern Railway (hereinafter called Joliet), operates over approximately 5 miles of petitioner's main line. Petitioner leases a portion of its Dearborn Station to Fred Harvey and to *262 Railway Express Agency. Petitioner has numerous other leases and agreements relating to the use of parts of its properties, none of which produce payments to petitioner in excess of $10,000 per annum. The services furnished by petitioner to shareholders consist of switching their passenger cars, and repairing, servicing and other incidental work performed at the coach yard and car shops in getting trains ready for outbound movement. Petitioner also operates, for its own account, an industrial switching service and a limited suburban passenger service between Dearborn Station and Dolton, Illinois. In 1882, at the time of petitioner's formation, shareholders (or their predecessors) acquired all outstanding stock of petitioner and entered into an Inter-Tenant Agreement dated November 1, 1882 (hereinafter called the 1882 agreement) between themselves and petitioner. This agreement provided for the leasing of petitioner's common property and the furnishing of terminal facilities and other services to shareholders. Petitioner executed leases for exclusive property individually with the respective users at a rental based upon the interest charges on petitioner's bonds plus the operating *263 expenses and taxes allocable to their individual leases. The 1882 agreement also provided for payment of petitioner's working expenses by shareholders for the use of common facilities and services at cost which was to be determined by reference to a formula contained in the agreement. This basic agreement for payment of working expenses by shareholders for the use of common property and services was included in the various amendments and modifications to the 1882 agreement. In addition to the facilities and services furnished shareholders, petitioner makes certain services and facilities available to other railroads which are not shareholders. Belt leases Belt division under a lease which provides for the payment by Belt of (1) the entire cost of the management, operation, maintenance, repair, renewal, and insurance of, and all taxes, liens, and assessments on Belt division, and (2) an annual rental of $854,248.31 plus the interest on all outstanding obligations of petitioner, the proceeds of which have been used for additions and betterments to Belt division subsequent to September 2, 1912. Prior to January 1, 1948, the expenses of petitioner in connection with the common property *264 and services furnished shareholders were allocated under certain formulae, the interpretation and application of which were subject to dispute by the various shareholders. The allocation of expenses under these formulae led to protracted litigation between petitioner and certain of the shareholders and even between shareholders among themselves. In 1947, litigation was pending in the United States District Court for the Northern District of Illinois, Eastern Division (hereinafter called the trial court) on mandate from the Court of Appeals for the Seventh Circuit. The Court of Appeals required that: The decree to be entered should provide that [petitioner] should restate its account charging some of the lessees with the difference between what they have paid and what they should pay on a wheelage basis, and crediting others with the difference between what they have paid on an equal basis, and what they should have paid on a wheelage basis. * * * [Chicago & W.I.R. Co. v. Chicago & E.R. Co., 140 F. 2d 120, 126.] Pursuant to the mandate, the trial court directed petitioner to prepare a form of decree (hereinafter called the decree), which complied with the directions *265 of the Court of Appeals. After petitioner prepared the decree controversy developed as to whether the decree correctly applied the criteria contained in the mandate. The trial court directed petitioner to compile money-judgment figures based upon the criteria set forth in the decree. This would have required extensive work on the part of petitioner and much time. Three months were allowed by the trial court for compiling these figures. Counsel for petitioner thought that the then pending proceedings would be further appealed consuming an estimated 2 or 3 years. A $50,000,000 bond issue of petitioner was due in 1952 and petitioner's counsel was of the view that if the disputes involved in the litigation were not resolved the bond issue could not be refinanced and that if the litigation continued for 3, 4 or 5 more years the matter would probably end up in bankruptcy court involving petitioner's reorganization. The parties sought an out-of-court settlement ending the litigation. On September 9, 1947, the president of Wabash called a meeting of the executives of shareholders, to be attended also by executives of petitioner, to discuss the pending litigation and "all possible methods *266 of disposing of this litigation to the best interests of all the parties and particularly [petitioner] * * *." The president of Wabash stated that shareholders must reach an agreement in lieu of allowing the decree to be put into effect since the financial burden of the decree would assuredly bring on further appeal and since the decree would require shareholders to make payments to petitioner of about $1,772,000 upon which income tax would be payable. Another meeting, to be composed of shareholders' chief accounting officers, was set up for the purpose of preparing a plan of accounting for all income and expenses of petitioner on a "100% joint facility basis" to be effective January 1, 1948. This meeting of chief accounting officers of shareholders, at which petitioner was also represented, was held on September 23-26, 1947. The report of this meeting stated that such a system would be practicable since petitioner's primary purpose is to serve as agent to furnish terminal facilities for its shareholders at cost and since shareholders are obligated to pay the entire principal and interest debt of petitioner. Two chief accountants of Erie were sent to Kansas City to gain information *267 as to the method used by the Kansas City Terminal Railway Company whereby it clears all of its revenues and expenses each month into its proprietary companies with the result that no taxable income remains. On October 7, 1947, the executive officers, counsel, and accounting officers of shareholders and petitioner held another meeting at which a tentative supplement (hereinafter called the proposed agreement) to the 1882 agreement was agreed upon. On October 7, 1947, the board of directors of petitioner met, approved the proposed agreement, and ordered all necessary documents to be prepared. The proposed agreement gave rise to correspondence between various executives and shareholders' counsel explaining it, stating what they expected to accomplish, and expressing their views and recommendations. On September 9, 1947, the vice president of Erie wrote the president of Erie a letter in reference to the shareholders' meeting of the same date in which he conveyed the views of the president of Wabash pertaining to the decree and necessity of an out-of-court settlement. The effect of the proposed agreement upon Erie was stated in substance as follows: 1. Potential payments of *268 withheld management expenses of petitioner claimed to be due from Erie would be eliminated as would the disputed claims of the other shareholders. 2. Erie's contention as to apportionment of management expenses would be adhered to in the future, resulting in a saving of approximately $60,000 per year compared with the previous method. 3. If the proposed joint facility arrangement could be worked out, it would eliminate the payment of income tax by petitioner with a direct financial benefit to each of the shareholders. 4. The interests of petitioner lie in settling this litigation in light of the proposed refinancing and other problems facing petitioner. 5. The proposed agreement would cut off the pending claims of all shareholders and with them Erie's claim for between $25,000 and $50,000; however, other shareholders are waiving much higher potential payments. On September 29, 1947, the comptroller of Erie wrote a letter to Erie's president dealing primarily with the "100% joint facility" aspect of the proposed agreement and analyzing its effect. The letter concluded: Summarizing the foregoing, it is clear to us that if the plan proposed by the Accounting Committee be adopted *269 and be made effective as of January 1, 1948, the Erie and the other [shareholders] will each derive substantial benefits. It is difficult to state these benefits figurewise. They, however, are obvious as [petitioner] will not have any taxable income in future years and will, thus, save about $145,000 per year which it has been paying for Federal Income taxes. This saving, together with the net income derived from the other operations (excess of income items over charges), will be apportioned to the [shareholders] currently and thus operate to reduce their current bills for operation, maintenance, interest, etc. The reduction in charges of [petitioner] against Erie will operate to increase Erie's taxable income and thus increase Federal taxes in years when the Erie has taxable income, but it will relieve [petitioner] of paying any income taxes and taxes heretofore paid by Erie on dividends received from the [petitioner]. In years in which there is no taxable income (three of the [shareholders] are in this position with respect to 1947) there would be a cash saving to the Erie and the other [shareholders] of the taxes which would be payable by [petitioner]. The [shareholders] *270 have everything to gain and, as far as we can determine, have nothing to lose. It is, therefore, our recommendation that we go along with the proposed plan. A memorandum dated December 23, 1947 from the president of C. & E.I. to its board of directors designed to inform the board of the nature of the controversy and litigation and to appraise the effect of the proposed agreement upon C. & E.I., stated in substance that the subject matter of the controversy was whether various types of petitioner's expenses should be charged to shareholders on an ownership basis of one-fifth each, or on a user basis. The memorandum brought out that C. & E.I., being the largest user, stood to lose as much as $2,000,000 due to the reallocations required by the decree. It also pointed out that the method used by petitioner pursuant to the 1882 agreement of allocating the Federal income taxes to shareholders for reimbursement resulted in additional taxable income to petitioner upon which the Government again exacted a tax, thus artificial income to petitioner was created from which only the Government benefited. The proposed agreement still provides for apportionment of Federal income taxes, however "it *271 is hoped that the new method of apportioning the expenses of the [petitioner] will eliminate entirely any future Federal income taxes." The memorandum advises the board that the proposed agreement provides for the dismissal of pending litigation and that each of the parties is to release all of the other parties from all existing claims. This would completely wipe out C. & E.I.'s potential liability of approximately $2,000,000 for past years. An undated memorandum (marked to indicate that it was received in the office of the president of Monon on December 11, 1947) from the vice president and general counsel of Monon to the executive committee of its board of directors, reviewing the background of the pending litigation and expressing views on the decree and on adoption of the proposed agreement, stated in substance: The proposed agreement would, in estimation of counsel, result in greater expense to Monon than the probable outcome of the litigation if carried to final conclusion. However, he recommends that serious consideration be given to approval of the proposed agreement for the following reasons: (1) Petitioner must refinance 50 million dollars of bonds due in 1952, Monon *272 being financially liable for $7,672,774 plus the fact that other bonds of petitioner upon which shareholders are also liable come due in 1962, and pending litigation would seriously jeopardize such refinancing; (2) the financial burden of the decree would probably bankrupt C. & E.I.; (3) since the city of Chicago is presently trying to force construction of new facilities upon petitioner, shareholders should be united to properly represent their interests; (4) the presence of litigation is a disrupting influence upon petitioner preventing its best service to shareholders; (5) if Monon grows as expected it will use petitioner's facilities more and gain rather than lose from the method of allocation used in the proposed decree; (6) Grand Trunk, whose views in pending litigation correspond with Monon's, has decided not to pursue the controversy further so that if Monon wishes to continue it would have to bear the full burden. No mention was made of the effect of the "100% joint facility" element of the proposed agreement. A memorandum dated December 23, 1947 from the president of Monon to its board of directors, in addition to a complete summary of the facts leading to the proposed *273 agreement, states in substance: The 1882 agreement set up the manner in which various expenses should be apportioned between shareholders. The present controversy deals with this apportionment going back as far as 1929. If the decree were to be put into effect, large payments would be made by shareholders to petitioner upon which income tax would be paid and the remainder distributed back to shareholders equally as dividends. Grand Trunk and Monon would receive a small excess of dividends after paying a large amount to petitioner. The purpose of the proposed agreement is to effect a withdrawal of the pending litigation. It sets down the method of apportionment of expenses and will place petitioner on a "joint facility basis" instead of being an independent service. Under this "joint facility method" all of petitioner's revenues from separate operation would be apportioned equally among shareholders and the costs of petitioner's separate services would be added to their present joint facility expenses. Petitioner would have neither revenue nor expenses for its separate operations since both would be equally apportioned among shareholders. Petitioner would then have neither an income *274 nor a loss, thus would pay no income taxes. Monon's management believes that Monon will derive financial benefit from the proposed agreement by reducing the rents and apportioned expenses which it will have to pay in the future below the basis that would follow as a result of the methods set forth in the decree. Thus Monon will pay petitioner less under the proposed agreement than is presently being paid or that which would be paid under the decree, even after allowing for discontinuance of dividend income which will follow the introduction of the "joint facility basis" of accounting. Failure to approve the proposed agreement will probably prolong expensive and uncertain litigation which will be harmful to petitioner, and thus shareholders, at this particularly important time. It is only problematical whether the decree would be advantageous to Monon and if the lawsuit is to be continued, Monon must take over the responsibilities of Grand Trunk in prosecuting the case, bringing on possible counter-litigation which could result unfavorably to Monon. The board of directors is requested to approve the proposed agreement. During the period of negotiations on the proposed agreement, representatives *275 of shareholders held meetings which were acrimonious in nature and numerous disputes arose between the parties pertaining to the method of allocating various expenses of petitioner. Counsel for petitioner made repeated visits to the court in which litigation was pending to give the judge progress reports. As late as November 19, 1947, counsel for Grand Trunk and Monon were of the opinion that it would be "utterly useless" to meet with the other parties to the litigation to give consideration to the then latest draft of the proposed agreement. On November 21, 1947, counsel for Grand Trunk sent a memorandum to Grand Trunk's general counsel setting forth substantial differences between the position of Grand Trunk and Monon and that of the other parties to the proposed agreement. The proposed agreement was finally adopted and on December 31, 1947, it ripened into an amendment to the 1882 agreement. The new agreement was termed Supplemental Inter-Tenant Agreement of 1947 (hereinafter referred to as the 1947 agreement). On December 10, 1947, petitioner's board of directors approved the execution of the 1947 agreement by adopting its provisions as set out on a preliminary copy of the *276 1947 agreement. The 1947 agreement was presented to the Interstate Commerce Commission and approved by it on May 3, 1948. On May 17, 1948, pursuant to stipulation, the trial court dismissed the litigation before it involving petitioner and shareholders. The 1947 agreement, which modified the 1882 agreement as to the allocation of the various types of expenses connected with the operations of petitioner, provided that: 3. * * * The Working Expenses shall be borne by the users of the property, special facilities and services of [petitioner] devoted to the common use of itself and railroad tenants and paid monthly on the bases of user as hereinafter set out. * * *
5. The "Working Expenses" of [petitioner] shall include all (a) taxes * * *; (c) special assessments * * *; (d) costs of complying with any and all requirements imposed by national, state or municipal authority * * *; (e) retirement costs * * * of * * * the common property of [petitioner]; (f) rentals * * *; (g) license fees * * *; (h) costs of management of [petitioner], its property, business and activities; (i) costs of furnishing any and all services provided by [petitioner] for the common use of *277 itself and its railroad tenants; (j) costs * * * of operating, maintaining, repairing and renewing the property, facilities and equipment of [petitioner] devoted to the common use of itself and its railroad tenants * * *; and (k) such other expenses and obligations of [petitioner] * * * primarily attributable to * * * the common property or services of [petitioner] or to the use made thereof by the several users thereof; * * * 6. Working Expenses which, by reason of their nature, are identifiable with some section of the common property, shall be paid by all of the users of that section in proportion to their respective wheelage uses of such section; * * * And, in addition, in lieu of paragraph 11th of the 1882 agreement, which was canceled and which read as follows: 11th. * * * and as * * * [petitioner] will have income from other sources, which may properly be divided among its stockholders * * * it is hereby agreed that, at the close of each quarter year, beginning from the date of this instrument, * * * [petitioner] shall divide, equally, between the * * * [shareholders], and pay to them as its shareholders, all money received by it, from whatever source, except *278 * * * that which may be paid to it by the * * * [shareholders] on account of "working expenses," * * * paragraph 11 of the 1947 agreement provides: 11. All revenues, income and profits accruing to * * * [petitioner] (including retirement losses on depreciable property, but excluding profits from the sale or other disposition of property held under exclusive lease by any of the * * * [shareholders]), except those which may be paid to it on account of expenses or other obligations, shall be disposed of and applied by * * * [petitioner] as follows: (a) The revenues from concessions and privileges in respect to passenger stations shall be applied as a credit monthly to the cost of operating the respective stations to which the concessions and privileges attach. (b) The remainder shall be paid in equal proportions of one-fifth each to the * * * [shareholders] and shall be credited monthly and applied as reductions of their rental obligations under leases and supplemental leases between * * * [petitioner] and the several [shareholders]. In accordance with paragraph 11 of the 1947 agreement petitioner reduced the accounts representing receivables from shareholders *279 and allocated a like amount among various expense and income accounts so as to reduce the revenue, income and profits of petitioner as follows: 1950
1951
Receipts
$1,277,233.32
$898,666.99
Expenditures
238,829.67
216,327.36
Net reductions of
amounts otherwise
owed by [sharehold-
ers]
$1,038,403.65
$682,339.63 The above amounts were derived from petitioner's transactions with nonshareholder users of petitioner's property and capital transactions. In the absence of the above reduction, the income of petitioner would have been proportionally higher. Petitioner, pursuant to the standard classification of accounts as prescribed by the Interstate Commerce Commission, closed its operating revenue and operating expense accounts, as previously adjusted under paragraph 11 of the 1947 agreement, into control accounts, the net balances of which were shown on petitioner's income tax returns for the years 1950 and 1951. Income statements contained in petitioner's annual reports from 1943 to 1951 show net income (or loss) before Federal income taxes - Net income
Year
(or loss)
1943
$390,966.27
1944
351,460.02
1945
349,741.81
1946
442,936.32
1947
275,737.98
1948
(10,638.85)
1949
(30,199.59)
1950
(286,047.21)
1951
(3,580.28)
*280 and its balance sheet in the annual report for 1944 shows an accumulated surplus balance of $1,985,646.98 as of December 31, 1943. From 1913 through 1951 petitioner paid dividends equally to shareholders as follows: Year
Amount
1913
$510,000
1914
900,000
1915
300,000
1916
592,000
1917
550,000
1918
300,000
1919
300,000
1920
300,000
1921
$300,000
1922
300,000
1923
425,000
1924
425,000
1925
300,000
1926
300,000
1927
300,000
1928
300,000
1929
$300,000
1930
800,000
1931
300,000
1932 -
9 mos.
225,000
1933
None
1934
None
1935
None
1936
300,000
1937
300,000
1938
300,000
1939
300,000
1940
$300,000
1941
300,000
1942
300,000
1943
300,000
1944
300,000
1945
300,000
1946
300,000
1947
300,000
1948
None
1949
None
1950
None
1951
None
Petitioner, or others acting in its behalf, have explained the results and changes brought about by paragraph 11 of the 1947 agreement at various times after it was effectuated. In a circular dated May 7, 1952, in connection with the issuance of $64,239,000 of petitioner's bonds, it is stated that: Since January 1, 1948, under authority granted by the Interstate Commerce *281 Commission and as provided under the terms of * * * [the 1947 agreement], the property has been operated as a joint facility, and the amounts which in 1947 and prior years reflected profits and losses are now applied monthly as adjustments of rentals paid to [petitioner] by the five [shareholders]. Elsewhere in the same circular there appears the following: An analysis of the rental bills for 1951 (other than for operating expenses and taxes) rendered to the various tenants of [petitioner] is set forth below. All the rentals, except as indicated, were paid to the Trustee of the Consolidated Mortgage or to the Trustee of the First and Refunding Mortgage of [petitioner]. Rentals Paid
Rentals
for Jointly
Paid for
Used Property
Exclusive Property
Total
C. & E.I.
$ 276,291.69
$ 161,728.14
$ 438,019.83
Monon
276,291.70
47,919.60
324,211.30
Grand Trunk
276,291.69
22,443.58
298,735.27
Wabash
276,291.68
151,607.81
427,899.49
Erie
276,291.68
95,929.60
372,221.28
Total - owner roads
$1,381,458.44
$ 479,628.73
$1,861,087.17
Santa Fe
$ 85,000.00 *
$ 85,000.00 *
Joliet
11,062.32
11,062.32
Belt
17,316.64
1,585,285.74
1,602,602.38
Total
$1,494,837.40
$2,064,914.47
$3,559,751.87 **
*282 In its request for listing certain of its bonds on the New York Stock Exchange petitioner stated as follows: Effective January 1, 1948 under authority granted by the Interstate Commerce Commission, and as provided under the terms of * * * [1947 agreement] certain changes were made in the accounting methods of * * * [petitioner]. The property since that date has been operated as a joint facility and the profits and losses which have heretofore accrued to * * * [petitioner] are now applied monthly as adjustments of rentals paid to * * * [petitioner] by the five * * * [shareholders]. This same statement appears in petitioner's annual report for the year 1948 in the "Report of Independent Public Accountants," followed by the following statement: Under provisions of the * * * [1947 agreement], effective January 1, 1948 depreciation accruals on depreciable property and losses resulting from disposal or retirement of nondepreciable property are borne by the *283 * * * [shareholders] * * * Petitioner's annual report for the year 1950 explains a $257,059.05 decrease in the joint facility rent income by stating that: The decrease of $257,059.05 in "Joint Facility Rent Income" is due to increase in amounts paid to * * * [shareholders] charged to this account, representing profit from sales of real estate and equipment during the year which were credited to Profit and Loss; [and certain other items]. On May 7, 1952, petitioner successfully refinanced bonds then due by selling $64,239,000 principal amounts of its mortgage bonds which were unconditionally guaranteed jointly and severally by endorsement as to principal, interest, and sinking fund payments by each of the shareholders. Respondent, in his deficiency notice, determined the deficiencies involved herein with the following explanation: (a) There has been added to income disclosed in your return the following net income which you failed to include therein. These amounts represent income from rents, services, gains and profits growing out of the ownership or use of or interest in property and from business carried on for profit, as defined in section 22(a) of the Internal Revenue *284 Code of 1939. The contention that any part of these amounts is excludible from your income or is deductible from income under section 23, or any other section, of the Internal Revenue Code of 1939, is denied. Opinion Petitioner contributed terminal facilities in Chicago to its five railroad shareholders. Its facilities were also used by some nonshareholders. For many years after its organization, petitioner had charged its shareholders and the others for these services, reported its net income for Federal tax, which was paid and for which payment it was reimbursed by the shareholders, and distributed the resulting net income to its shareholders, which they in turn treated as taxable dividends. The mandate of a Federal court of appeals resulting from litigation among the shareholders, Chicago & W.I.R. Co. v. Chicago & E.R. Co., 140 F. 2d 120 (C.A. 7, 1943), certiorari denied 322 U.S. 747, rehearing denied 322 U.S. 772, would have changed the proportion but not the manner of these operations. Instead of complying with the mandate, an agreement of settlement was adopted employing a "100% joint facility" approach whereby, in brief, as to the *285 property used by any of them, the shareholders agreed to be charged for their respective proportionate share of the expense of operating those facilities on a "wheelage," or use, basis. As to nonshareholder income, apparently including net charges to nonshareholder railroads and proceeds of sale of capital assets, the agreement called for equal division among the five shareholders and the corresponding credit to the charges made for facility use. Petitioner is not a tax-exempt cooperative under section 101, I.R.C. 1939. But even so, we are spared the necessity of considering whether petitioner must treat as income the receipts from its shareholderpatrons. See Pomeroy Cooperative Grain Co., 31 T.C. 674 (1958), affirmed this issue 288 F. 2d 326 (C.A. 8, Mar. 20, 1961); Juneau Dairies, Inc., 44 B.T.A. 759 (1941); Uniform Printing & Supply Co., 33 B.T.A. 1073 (1936), reversed on other grounds 88 F. 2d 75 (C.A. 7, 1937). Cf. Farmers Union Cooperative Exchange, 42 B.T.A. 1200 (1940); Southwest Hardware Co., 24 T.C. 75 (1955); Clover Farm Stores Corporation, 17 T.C. 1265 (1952). Respondent *286 does not here seek to do more than to charge petitioner with net nonshareholder income which is, as we have said, employed as setoffs against the shareholders' "wheelage" charges and thus does not appear in petitioner's computation of its income. Cf. Lake Erie & Pittsburgh Railway Co., 5 T.C. 558 (1945). In this, we think respondent is correct. In Anaheim Union Water Co., 35 T.C. 1072 (Mar. 29, 1961), we were faced with a factual situation almost identical to the one now before us. In that case, two similarly "nonprofit" corporations (not exempt from tax) furnished services primarily to their shareholders, but also received substantial income from nonshareholder sources. Both taxpayer-companies fixed their charges to shareholders at figures which approximated the cost of rendering the shareholder-services less the net income from other sources, leaving these taxpayers without a profit. In that case we upheld a deficiency determined by computing the amount by which expenses or costs incurred in rendering services to shareholders exceeded payments received from the shareholders for these services. It would be impossible to reconcile a determination here in *287 petitioner's favor with the Anaheim case. As in that case: It is plain from the record before us that the directors deliberately fixed the * * * rates [charged to shareholders] at such level that when the amounts paid by the shareholders * * * are added to the corporation's income from * * * other sources the sum will be such that after subtracting the cost of supplying the * * * [shareholder-services] no net taxable income remains. * * * In the instant case, as our findings show, one of the shareholders stated: Summarizing the foregoing, it is clear to us that if the plan proposed by the Accounting Committee be adopted and be made effective as of January 1, 1948, the Erie and the other [shareholders] will each derive substantial benefits. It is difficult to state these benefits figurewise. They, however, are obvious as [petitioner] will not have any taxable income in future years and will, thus, save about $145,000 per year which it has been paying for Federal Income taxes. This saving, together with the net income derived from the other operations (excess of income items over charges), will be apportioned to the [shareholders] currently and thus operate to reduce *288 their current bills for operation, maintenance, interest, etc. Petitioner contends that the operative 1947 agreement was made at arm's length. There is no doubt that the agreement was at arm's length as to the five shareholders, but it is hard to conceive how it could have been at arm's length as between the five shareholders on one hand and petitioner on the other. The action of petitioner in dealing with its shareholders as a group again is similar to the situation presented in the Anaheim case, where we said, referring to such cases as Horace E. Podems, 24 T.C. 21 (1955): Anaheim's purposeful arrangement of not seeking full reimbursement of its * * * [shareholder-business] costs from its shareholders makes the denial of deductions in those cases especially significant. Since Anaheim's amended articles of incorporation provided that * * * [services were] to be supplied to the shareholders "at cost", it appears that there was ample authority for the directors to fix the rates so that the company would be fully reimbursed for its * * * [shareholder] expenses without regard to other income. Moreover, even if it be assumed that the directors had no such power by *289 reason of changes in by-laws or otherwise, such lack of power would merely be a consequence of arrangements voluntarily accepted by Anaheim and would therefore be irrelevant here. * * * [The] fact that * * * [Anaheim] deliberately chose * * * blending its profitable non * * * [shareholder] operations with its * * * [shareholder] business, does not entitle it to claim successfully * * * that its directors were required to fix the rates so as to operate the * * * [shareholder] business at a loss. The second corporation dealt with in the Anaheim case, SARD, was required by "agreement" to make virtually the same computation as the one called for under paragraph 11 of the 1947 agreement. Petitioner had to apply its "revenues, income and profits" to its reimbursable costs before billing its shareholders. As to the similar "computation" in the Anaheim case, we said: Unlike Anaheim, SARD by agreement with its shareholders in 1944 was specifically required to apply its "rents, issue, and profits" from its * * * [nonshareholder revenues] to its * * * [shareholder] service expenses before billing its shareholders for them. However, we do not consider this difference crucial. *290 It is no more "ordinary and necessary" for a corporation by agreement to expend more for its services than it is paid than it is to do the same thing without an agreement. * * * See also United States Industrial Alcohol Co. v. Helvering, 137 F. 2d 511, 518 (C.A. 2, 1943), reversing in part 42 B.T.A. 1323 (1940); Los Angeles & Salt Lake Railroad Co., 4 T.C. 634, 649 (1945); Eastern Carbon Black Co. v. Brast, 104 F. 2d 460, 464. Petitioner contends further that under the form of the deficiency notice it not merely showed that all of its gross income was reported but that since this showing has been made the burden rests upon respondent in every other respect. We reject petitioner's contention because of the failure of its premise in at least three respects. First, the Commissioner may determine a deficiency for a stated reason which is incorrect and the burden will still be upon petitioner to show the absence of any deficiency. Zimmerman Steel Co., 45 B.T.A. 1041 (1941), reversed on other grounds 130 F. 2d 1011 (C.A. 8, 1942). See the concurring opinions in Anaheim Union Water Co., supra. *291 Second, respondent did not so limit the determination here but stated instead that: (a) There has been added to income disclosed in your return the following net income which you failed to include therein. * * * The contention that any part of these amounts is excludible from your income or is deductible from income * * * is denied. Of course there could be an omission of net income, either by an erroneous exclusion from gross income or an improper deduction, so that if the record fails to show that petitioner both reported its total gross income properly and that it arrived at its net income by using only authorized deductions, petitioner's burden would not be met and the deficiency would have to be sustained. And thirdly, if it be contended that the form of the deficiency notice was defective, petitioner's remedy was to insist on a more precise statement of the respondent's position; although, here, the basic reason for granting such relief, namely, that the petitioner has been misled or confused, is obviously not present on this record. [1]
*292 In the Anaheim case there was likewise some discussion as to the thrust of respondent's action: Although the question for decision has been variously stated by the parties from time to time - and subtle differences may perhaps be thought to turn upon the form of the statement - we think that the real issue before us is whether the * * * costs or expenses [for services rendered to shareholders] incurred by Anaheim are ordinary and necessary expenses on this record to the extent that they exceeded the amount which Anaheim obtained for such * * * [services] from its shareholders. * * * And we added there: Anaheim's operations are similar in many respects to those of a cooperative and the question presented in Pomeroy [supra] of properly reflecting the taxable income obtained from transactions with non-members (though raised in the context of an income rather than expense problem) is not unlike the issue of properly reflecting Anaheim's non-shareholder income from * * * other sources. * * * Concerning this, the dissenting opinion in the Anaheim case adds only: As pointed out in the majority opinion, Pomeroy Cooperative Grain Co., 31 T.C. 674, *293 dealt with a problem of what constitutes gross income and not with what is an ordinary and necessary business expense. I do not think it is applicable here. * * * By the "joint facility" arrangement, no substantive alteration was intended in petitioner's operations. Only its accounting policies were changed to eliminate petitioner's taxable income. Petitioner computed the shareholder rental charges, entered them on its books as incurred by the shareholder, then periodically reduced them by the results of dealings with others. The shareholders recognized that no further dividends, as such, would be paid to them by petitioner, their reduced payments for the use of petitioner's facilities making up the difference. This circuitous arrangement is similar to that used by the shareholders in the Anaheim case: In essence, the entire set-up is merely a device to distribute the * * * other unrelated income to the shareholders. Although Anaheim was clearly not incorporated for that purpose in 1884, the fact nevertheless remains that it has been used for that purpose in recent years. * * * And we are of the opinion that the * * * expenses [pertaining to shareholder-services] incurred herein *294 in excess of the amounts which the directors reasonably expected to obtain for * * * [these services] were not "ordinary and necessary" expenses, but were merely part of a plan to distribute otherwise taxable income to the shareholders. To this it may be added that even if petitioner were correct in claiming that the present deficiency is based on an omission from gross income, and that this is to be distinguished from any issue as to deductions, the present record demonstrates that such an omission did in fact take place. Petitioner's auditor, produced as a witness by petitioner, testified: "Q. * * * On the schedule [Exhibit ZZ] under the revenue income and profits, isn't there an item called surplus and other rentals? A. Yes, sir, there is. Q. Where does that come from? A. Well, that comes from rental paid [by] the Belt, the Santa Fe, the * * * [Joliet] and miscellaneous companies. Q. These are not stockholders, are they, * * *? A. No, sir, they are not. Q. Now, in the tax return, there is a joint facility rental account; is that correct? A. Yes, sir. Q. Is that amount that is shown on the tax return, is that the amount that is charged to the proprietors *295 before it is reduced by the credit shown on Exhibit ZZ, or is it after? A. It is after. Q. In other words, if it were not for the credits to each of these proprietors, the tax return would show a higher amount for joint facility income? A. That is correct. This is a part of the reduction of their rental payment. Q. Now, you have computed the profits from the Belt, the Santa Fe, the * * * [Joliet], is that correct? A. That is right. * * *
Q. And those profits are distributed as a reduction of the rentals due in [for?] the joint facility from the proprietors? A. Yes, sir." [2]
Counsel for petitioner maintains that the witness was "confused." But not only was there no evidence produced to contest or clear up this "confused *296 testimony," but it appears to bear on the very matter of omission of gross income. Moreover, charges had first to be made to the shareholders for the facilities used by them on a "wheelage" basis or there would have been no purpose in the final settlement reached by the shareholders, and no method of putting into effect the terms of that settlement as it effected a disposition of the inter-shareholder dispute relating to the distribution of petitioner's expenses for shareholder-used facilities. [3] Only after these charges had been entered on the books did petitioner offset against them the one-fifth share of net nonshareholder income credited to each shareholder. [4] But the total charges accrued for proprietary (shareholder) charges never appeared as part of gross income on the return because, as the testimony shows, the offset was accomplished before final gross income was computed. It is, in fact, difficult to perceive that this is even an issue in the case. The petition states: "(d) Under the provisions of the 1947 agreement the other parties thereto agreed to pay to the petitioner various expenses of petitioner in consideration of (1) the right to use in common certain properties *297 of Petitioner, (2) Petitioner agreeing to pay to them certain receipts of Petitioner, thereby effecting a reduction in the amounts paid by such other parties for the common use of such properties, and (3) mutual release between the parties of any and all claims arising out of agreements of 1882 and 1902. * * *
"(f) In accordance with the provisions of the 1947 agreement, Petitioner paid or credited to the accounts of the other parties to the 1947 agreement the following receipts of Petitioner reduced by certain expenditures of Petitioner, which payments or credits served to reduce the amounts otherwise payable by said other parties for the common use of a portion of Petitioner's property: 1949
1950
1951
Receipts
$1,029,188.59
$1,277,233.32
$898,666.99
Expendi-
tures
187,833.46
238,829.67
288,692.00
Net
amounts
paid or
credited
to said
other lparties
$ 841,355.13
$1,038,403.65
$669,974.99"
*298 These figures are admitted by respondent's answer to be correct. [5] And, as we have already seen, the petition is quite in accordance with the facts. For the reasons stated, and on authority of Anaheim Union Water Co., supra, we think the deficiency was correctly determined.
Decision will be entered for the respondent. Footnotes
*. Includes $15,000 paid direct to [petitioner] by Santa Fe. ↩
**. Includes $525,850.75 surplus rentals [profit from the rent received from the nonshareholders] returned to [shareholders] in equal shares.↩
1. In his opening statement petitioner's counsel stated: "The [assessments] in question are based on the alleged omission of substantial amounts of income from petitioner's tax returns. However, petitioner will prove that all of such income was included in the tax returns in accordance with respondent's requirements. While this will dispose of the issue which has been raised in the pleadings, petitioner desires to have this Court dispose of the real issue in the case which has only been indirectly touched upon in the pleadings. * * *"↩
2. The auditor further testified: "Q. Now, is that a credit, * * * of the total revenue from the non-stockholders, or is it just the profit from the non-stockholders, the credits that are shown at the bottom of Exhibit ZZ? A. That is just the net. * * * It is the profit from the rent received from the non-stockholders. * * *
Q. And just means something over the cost of the actual operation of the property? A. That is correct."↩
3. This is borne out by the terms of the 1947 agreement as appears from our findings, for example: "* * * The * * * Expenses shall be borne by the users of the property * * * and paid monthly on the bases of user * * * "Working Expenses which, by reason of their nature, are identifiable with some section of the common property, shall be paid by all of the users of that section in proportion to their respective wheelage uses * * *" ↩
4. The language in the agreement is: "All revenues * * * accruing to * * * [petitioner] * * * except those which may be paid to it on account of expenses * * * shall be disposed of and applied * * * as follows: * * * (b) * * * paid in equal proportions * * * to the [shareholders] and shall be credited monthly and applied as reductions of their rental obligations * * *"↩
5. There is still no dispute as to figures although by supplemental stipulation the amount of $682,339.63 is substituted for $669,974.99.↩